HEMOLIN CO. v. HARWAY DYEWOOD & EXTRACT MFG. CO. et al.

(Circuit Court, S. D. New York. July 19, 1904.)

1. PATENTS—INFRINGEMENT—PROCESS OF MAKING LOGWOOD EXTRACT.

The Austen patent, No. 491,972, for an improvement in the art of making coloring matter from logwood, which covers a process and the resulting product, the process consisting of adding to logwood extract an alkaline nitrite in the presence of water, causing a reaction between them, and evaporating the product to dryness, when it is commonly ground and put up in the form of a dry powder, *held* not anticipated, valid, and infringed.

2. SAME.

Where a defendant charged with infringement of a process patent admits that his product is the same, and that in making it the same materials are used and steps taken as called for by the patent, a mere denial that the process followed is the same, without disclosing the one claimed to be used, is insufficient to negative infringement.

In Equity. On final hearing.

Harold Binney and S. L. Moody, for complainant.

W. P. Preble, Jr., and John J. Gleason, for defendants.

COXE, Circuit Judge. This is an action in equity for the infringement of letters patent No. 491,972, granted to Peter T. Austen, February 14, 1893, for improvements in the art of making coloring matter from logwood. The specification says that prior to the patent the coloring matter extracted from logwood was made in the form of a paste, a liquid, or of the consistency of thick pitch. Each of these forms is open to many practical objections which are enumerated. The specification then proceeds as follows:

"My invention meets and overcomes all these objections, giving a stronger and purer color. It consists of a process for making a solid coloring matter from logwood which is not affected by the extremes of atmospheric temperature, and which can be made and will continue and can be used in the form of a dry powder similar to a coal tar dye, and which has the same advantages of stability, rapid solubility in water, which are possessed by many coal tar dyes, and which allow of the same facility and accuracy in determining the proper proportions required. Being much freer from tannin and resinous matters it affords a practical substitute for chip logwood, and avoids the labor, time and expense required in the use of logwood in the form of chips. To carry out my invention I heat ordinary liquid extract of logwood and mix with it sodium or potassium nitrites in the proportion of about five pounds of solid nitrite to each one hundred pounds of liquid extract of 51° Twaddle. The mixture is then stirred and evaporated to a point at which it becomes solid

and brittle on cooling. The method I have employed with most satisfaction is the following: I heat ordinary liquid extract of logwood of 51° Twaddle to about 140° of Fahrenheit, and add to it in successive portions an aqueous solution of potassium, or sodium nitrite, in the proportion given above, thoroughly mixing them and maintaining the temperature. A copious evolution of gas takes place, which is facilitated by stirring, or agitation. The heating is continued with frequent or continuous stirring until the evolution of gas has ceased, and the mixture is sufficiently evaporated to form a solid mass on cooling, which is sufficiently brittle to be ground into a powder, if so desired. A coloring matter is thus obtained in the form of a powder which appears black in shadow and purplish black in strong sunlight and is practically soluble in cold water and rapidly soluble in hot water, having the characteristics heretofore described. It may be dyed on wool by the same method as logwood, by mordanting the material in the usual manner with potassium bichromate and potassium bitartrate, but adding to the dyebath about twenty-five per cent. of the weight of the coloring matter of acetic acid. The color thus produced is much stronger and deeper than that produced by dyeing with equal quantities of logwood extract of 51° Twaddle.

"The above method of procedure is the best to me at present known. But, as heat and time are frequently convertible conditions in chemical reactions, I do not limit myself to the temperature, nor to the exact proportions above set forth; the essence of my discovery and invention being, that when logwood extracts are treated with nitrite of soda or potash under such conditions as to bring about a reaction between them, a new product may be produced having the characteristics hereinbefore set forth."

The patent contains three claims, two covering the process and one the product. They are as follows:

"(1) In the art of making logwood extract, the improvement which consists in adding to logwood extract an alkaline nitrite in the presence of water and causing a reaction between the nitrite and the extract, substantially as described.

"(2) In the art of making logwood extract, the improvement which consists in adding to logwood extract an alkaline nitrite in the presence of water, causing a reaction between the nitrite and the extract and evaporating the product to dryness, substantially as described.

"(3) As a new article of manufacture, a coloring matter derived from logwood extract by the incorporation therewith of an alkaline nitrite, and characterized by the fact of its being a friable solid, soluble in cold and rapidly soluble in hot water, substantially as described."

The defenses are lack of novelty and invention and noninfringement.

It should be remembered that the essence of the invention is that when logwood extracts are treated with nitrite of soda or potash, under such conditions as to bring about a reaction between them, a new product, consisting of a permanent dry powder, soluble in cold water and rapidly soluble in hot water, is produced in which the gummy matters are expelled or rendered nonhydroscopic. The objections to the coloring matter extracted from logwood, which was in use previous to the patent, are set out at length in the description and, so far as the proof shows, are stated with substantial accuracy. The court is unable to find from the present record that any one before Austen made the new coloring matter covered by the third claim or used the method of producing it covered by the first and second claims.

The principal witness to the so-called Oakes prior use is George Stiff, but his testimony is too indefinite and uncertain to overthrow the presumption arising from the patent. When he entered the employment of the Oakes Manufacturing Company he was only about 15 years of age. He had no previous knowledge of chemistry, having

entered the factory from a Canadian farm. It is quite improbable that an ignorant lad would be able to appreciate and recollect the details of a chemical experiment made 18 years before, and the court cannot resist the conclusion that his description of what took place in 1884 or 1885 has been colored, innocently no doubt, by expert knowledge since acquired. The other witnesses called in corroboration disagree with Stiff in many important details. Mr. Oakes, the president of the company, never heard of the particular experiment described by Stiff and as it was a costly one, involving the expenditure of at least $700, it is exceedingly improbable that it occurred without the knowledge of the president. Mr. Oakes testified that he made and sold a dry powder chemically produced from liquid logwood extract; but he declined to state the method employed, regarding it a secret of his business. He says that he has used nitrite of soda since 1884, but refuses to give any further information on the subject. No sample of the powder is produced and the witness is unable to give the name of any customer who purchased it from his company. If the patented process were ever produced in the Oakes factory it was by accident and when the investigation in hand was proceeding along different lines. Certainly the importance of the discovery was not understood or appreciated, assuming that it was made. But was it made? The most favorable answer the defendants can expect to this question is that it may have been, and the answer is fatal to their contention. Instead of proof they offer inference and presumption.

The foregoing remarks apply with even greater force to the experiments of Beach, which fall far short of establishing anticipation beyond a reasonable doubt. Beach is neither a chemist nor a manufacturer of logwood extract. His work was experimental and resulted in no lasting benefit. No sample is produced. The dye extracts with logwood as the base manufactured by Mucklow & Company, of Bury, England, of which samples were submitted to Beach & Company, were not made pursuant to the process of the patent; at least there is no proof that they were. In fact, so far as the foreign extract can be judged from these samples "it contained a highly concentrated and oxidized form of hæmatein," costing twice as much as the patented product and was not in competition therewith. The name given it by the English manufacturers was "powdered hæmatein."

The testimony regarding the powder imported by Sykes is even less satisfactory. A sample, imported in 1893 for exhibition at the Chicago Fair, was introduced in evidence and the defendants' expert is unable to say that it embodies the invention of the patent.

The record contains a number of prior patents and publications, most of them having only a very remote application to the present controversy. The defendants' expert witness was asked to point out in any of these documents a suggestion of the use of nitrite of soda in the presence of water for modifying the resinous and other attractive matters in a logwood extract, in addition to such effect as may occur upon the hæmatoxylin, and he answered as follows:

"I cannot point out where it is especially mentioned that the use of nitrite of soda in the presence of water will modify the resinous and other attractive matters in the logwood. * * * I may mention in this respect the Avery

patent, and this is absolutely the only piece of literature I can point out in this connection."

It will not be necessary, therefore, to examine the other patents and publications. The Avery patent, No. 320,526, was granted June 23, 1885, for "improvements in the preparation of liquors or extracts of logwood." The specification contains this statement: "The chlorates in this operation appear to be reduced to chlorides and the nitrates to nitrites." The expert understands from this that the organic matter in the extract and the acid naturally present in the extract reduce the nitrates to nitrites, but he made no careful examination of the extract after treatment with nitrate and cannot state definitely what nitrite is formed. The patent is not for a dry extract, but for a liquor used directly in the dyeing bath, the effect of the nitrites on the extract is not claimed and there is nothing to indicate that Avery knew of their action in destroying or modifying the extracted matters. If Avery knew of the Austen invention and was endeavoring to impart that information to the public his use of language was most unfortunate. It is thought that no chemist, however skillful, would be able to practice the Austen invention after reading the Avery patent. The defendants are charged with infringement in the manufacture and sale of powders, samples of which are marked in evidence as Exhibits N and P. The defendants' brief admits that "defendants' powder agrees with claim 3 of the patent * * *˙ and many of the powders described in the prior art, in the well-known characteristics of being a friable solid, soluble in cold and rapidly soluble in hot water, and that it is derived from logwood extract. It is not, however, derived by the incorporation with the extract of an alkaline nitrite, although the nitrite of soda was used at one stage of the process." The defendants' contention seems to be that they escape infringement because the extract treated by them with nitrite is not ordinary but clarified, not a liquid but a paste, and because it is cured or fermented and by the previous addition of other ingredients its character has been substantially changed. In other words, they use the patented process, but add to and improve upon it. This is, in fact, admitted by the president of the defendant company, who was called as a witness by the complainant. He says:

"Q. Do you deny that you make logwood extract in making these powders? A. No. Q. Do you deny that you use a process which consists, among other things, in adding to the logwood extract an alkaline nitrite in the presence of water? A. I have answered that question that we did. Q. Do you deny that the addition of the alkaline nitrite causes a reaction between the nitrite and the extract? A. No. Q. Then what is there in the first claim, in any sense that you can give to it, which enables you to deny that you use the process therein mentioned, since you have just admitted that you do each one of the three phrases of that claim? A. That is not our process. Q. In your process you do other things in addition, do you not? A. Yes. Q. I ask you if you did what is mentioned in this claim without regard to additions? A. I have answered that, I think, in the affirmative. Q. Then the secret process which you are unwilling to disclose and which you say has differences does not lack any of the steps described in this patent but employs others which you refuse to tell about? A. Yes. Q. Do you deny that the process by which these powders 'P' and 'N' are made by your company employs a process which includes adding to logwood extract an alkaline nitrite, to wit, sodium nitrite in the presence of water, causing a reaction between the nitrite and the extract and evaporating

the product to dryness? A. We partly use it. Q. By the word 'partly' you mean you use it with additions which you refuse to disclose? A. Yes."

Further discussion is unnecessary. If there be any essential differences between the complainant's and the defendants' process the exact situation should be presented in order that the court may be able to form an intelligent judgment. All doubt would be removed if the secret process of the defendants were disclosed. Infringement seems clear and if the defendants can prove to the contrary they should do so. The mere assertion that their process is not that of the patent, without stating what their process is, does not meet the issue.

The complainant is entitled to the usual decree.